GULF-TEX BROKERAGE, INC.,
Plaintiff,

v.

McDADE & ASSOCIATES, Defendant.

Civ. A. No. 75–B–187.

United States District Court,
S. D. Texas,
Brownsville Division.

June 21, 1977.

---

Paul Q. O'Leary, Brownsville, Tex., for plaintiff.

L. Glen Kratochvil, Houston, Tex., for defendant.

DANIEL HOLCOMBE THOMAS, Senior District Judge.

The above-styled cause was heard by the Court without a jury and taken under submission on March 8, 1977. The Court, having examined the pleadings and evidence presented at the trial, makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. The plaintiff in this action, Gulf-Tex Brokerage, Inc. (Gulf-Tex) is the owner of the shrimp trawler CAYENNE MADCAP. Gulf-Tex claims that the defendant insurance broker, McDade & Associates (McDade) negligently handled a request it made for an extension of the MADCAP's hull insurance navigational restrictions. Ultimately, the extension was not approved, the vessel was damaged outside of the policy's limits, and the underwriter denied coverage. Gulf-Tex claims as damages against McDade the expenses it paid which would otherwise have been paid by the insurer.

2. The navigational limits in question are contained in the marine hull policy covering the MADCAP, Republic Insurance Company No. M1 2267, issued by Cravens, Dargen & Company, and are as follows:

"Waters of the Gulf of Mexico but not South of an imaginary line from Cape Sable, Florida to Cape Catoche, Mexico."

The policy further provided, at line 142, that:

"Any deviation beyond the navigation limits provided herein shall void the Policy." (Plaintiff's Ex. No. 1)

The MADCAP left Port Brownsville on Thursday, May 1, 1975, bound for Corn Island, Nicaragua, beyond the "imaginary line" which marked the outer limits of her hull policy coverage.

3. On Saturday, May 3rd, Lorenzo Lozano, port captain for Gulf-Tex, stopped by the office of Gulf-Tex' Brownsville insurance agent, Preston Caddell, and informed him that the MADCAP had left port for Nicaragua the previous Thursday. Caddell mentioned that this destination was beyond the navigational limits of the hull policy and that he, Caddell, should get the limits extended, and Lozano agreed. Caddell was contacted later the same day by Manuel Sanchez, president of Gulf-Tex. Sanchez also informed him that the MADCAP had left on Thursday, and told him to have the navigational limits extended to cover the voyage. Caddell told Sanchez that since it was a weekend, he would not be able to contact McDade until Monday.

4. Caddell called McDade on Monday, May 5th. The call was taken by Mike Schmidt, the account representative. Caddell informed Schmidt that the vessel had left port on Thursday, would leave the navigational limits of the present hull policy, and asked that the limits be extended to cover the trip to Nicaragua. Schmidt replied that he would "take care of it" and get back to Caddell. Schmidt made no mention of any possible problem in obtaining the extension even though he knew that the vessel had definitely left port and there was a good chance that the extension would not be granted under the circumstances.

Although he told Caddell that he would get back to him this was the last time Caddell heard from Schmidt or McDade until after the accident, when he was informed that the loss would not be covered.

5. Sanchez had, over the years, owned 138 shrimpboats at various times, 80% of which often fished foreign waters. His practice in securing extensions for these vessels had been to call the agent, tell him where the vessel was going, and have coverage extended to include the area. He testified that he had never to his knowledge been denied an extension, and produced, at the Court's direction, 14 different extension binders. (See affidavit of Manuel A. Sanchez, Jr. of March 15, 1977) It should be noted, however, that none of the extensions were on Republic policies, and none were obtained through McDade. Further, they do not tell us whether they were obtained before or after the vessels had left port. Sanchez stated that he was aware that each insurance company had its own procedures and restrictions on extensions, and that they were often different.

6. Sanchez testified that he had radio contact with the MADCAP and could have had the vessel hold up inside the "imaginary line" had he been advised that there was some question as to whether or not the coverage would be extended. He did not have the vessel wait because, due to the fact that McDade had not gotten back in touch with Caddell, he assumed the restrictions had been lifted.

7. The MADCAP crossed the "line" on May 6th, and stranded off the coast of Belize, British Honduras, outside the hull policy limits on May 9, 1975. The underwriter was notified by letter on May 12, 1975. Gulf-Tex' Brownsville office notified Caddell by telephone and McDade by telegram. The vessel was off the reef by May 23rd, but the underwriter advised Gulf-Tex on May 27th that the MADCAP was not covered due to a breach of the navigational limits of the hull policy. Caddell had meanwhile called McDade, and was told that McDade had a written memo from the underwriter refusing coverage. McDade had

not contacted Caddell or Gulf-Tex concerning the fact that the underwriter had denied the requested coverage. It is not clear just when McDade passed along the request, when they received the answer of the underwriter or whether the underwriter knew of the stranding before the decision on the application was made.

8. In his testimony at trial, Ross McDade, III, general insurance agent of McDade Associates, stated that a broker had an obligation to respond to a client's request for an extension, and further that a broker would have a duty to inform the client of any problems in complying with the request. He also stated that time is usually very important in these situations, and that he would have told Caddell to have Gulf-Tex hold up the vessel within the limits until coverage was confirmed.

9. The Court finds that McDade's failure to warn Gulf-Tex that the vessel might not be covered by its hull policy if it crossed the "imaginary line" before coverage was verified, and McDade's total failure to respond to Gulf-Tex' request for an extension of the navigational limits of the MADCAP's hull policy was negligent. The Court further finds that as a direct result of this negligence on the part of McDade, the MADCAP, and therefore its owner, Gulf-Tex, were unknowingly exposed to the risk that any damage sustained by the vessel would not be insured.

10. Gulf-Tex incurred and paid as an immediate result of the May 9, 1975, stranding and successful efforts to get the MADCAP off of the reef a total of

$7,460.22.[1] Also as a result of the stranding, the MADCAP's engine sustained extensive damage. This damage occurred when the director of the salvage operations was forced to use the engine under the unfavorable circumstances caused by the stranding to help get the vessel off the reef on which it was lodged.[2] The engine had been completely overhauled less than one year before the accident. Since the plaintiff's employees did the work, only the cost of the parts used is claimed, in the amount of $3,837.21.[3] The total cost of removing the MADCAP from the reef and repairing the damage caused by the stranding amounted to $11,297.43. The policy which was voided as a result of the defendant's negligence provided for a deductible in the amount of $2,500.00. Therefore, the Court finds that Gulf-Tex suffered a loss of $8,797.43 as a result of the defendant's negligence.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of this action by virtue of its admiralty and maritime jurisdiction. 28 U.S.C. § 1333.

2. The defendant in this cause had a duty to warn of any delay in effecting coverage of the plaintiff's vessel which duty defendant negligently failed to fulfill thus destroying plaintiff's opportunity to have the vessel hold up until coverage was confirmed. Defendant also violated its admitted duty to respond in a timely fashion to plaintiff's request for coverage. The defendant in this instance was acting as the agent of the plaintiff and had a duty to

---

1. The expenses in detail are as follows:

 a. Belize customs officials fee ....... $153.75
 b. Generator rental ................ 37.50
 c. Engine starter injector .......... 43.74
 d. Tug fees ...................... 875.00
 e. Watchman .................... 38.81
 f. Airplane charter ................ 1973.31
 g. Surveyor...................... 3150.00
 h. Boat rental ................... 125.00
 i. Taxi fare ..................... 18.75
 j. Deposit to Gov't of Belize for
 local labor ................... 1044.37
 TOTAL......$7,460.22

2. The engine overheated during the removal operation due to the fact that the keel cooler had been damaged by the reef during the stranding. Shortly after the vessel was off the reef the engine was found to have a cracked head and manifold.

3. Specific invoices were found to be in Corn Island and unavailable for production as directed by the Court, however, plaintiff has filed an affidavit which provides an itemized list of the parts used and their cost, a notarized copy of which is attached hereto.. If requested by the

keep the plaintiff informed as to the progress of the request. The defendant negligently failed to do so. The Court is of the opinion that the plaintiff's reliance in this instance was justified.

3. Plaintiff is entitled to recover the damages it suffered as a result of the defendant's negligence, that is, the amount plaintiff was caused to pay for removing the vessel from the reef and repairing damage caused by the stranding and which would have been paid by the MADCAP's hull policy had it not been voided as a result of the defendant's negligence. Plaintiff is entitled to recover $8,797.43 from the defendant.

A judgment in accordance herewith will be entered.

## JUDGMENT

This cause having come on for final hearing by the Court on March 8, 1977, and the Court having entered its Findings of Fact and Conclusions of Law in this matter, it is hereby ORDERED, ADJUDGED and DECREED that a Judgment in the amount of $8,797.43 (EIGHT THOUSAND, SEVEN HUNDRED AND NINETY–SEVEN DOLLARS AND FORTY–THREE CENTS), be, and the same hereby is, entered in favor of the plaintiff, Gulf-Tex Brokerage, Inc., and against the defendant, McDade & Associates.

It is FURTHER ORDERED that interest at the rate of 6% (six per cent) per annum be assessed from May 23, 1975, until payment.

Costs are to be taxed against the defendant.

## APPENDIX

## AFFIDAVIT

THE STATE OF TEXAS

COUNTY OF CAMERON

BEFORE ME, the undersigned authority on this day personally appeared, MANUEL A. SANCHEZ, JR., who being first duly sworn, deposes and says;

1) That the deponent is President of GULF–TEX BROKERAGE, INC., Plaintiff in the above captioned cause.

2) That in accordance with the undertaking of the Plaintiff to this Honorable Court, a search was made for the invoices from B. D. HOLT, INC., with reference to parts used in the repair of damages sustained by the Cayenne Madcap in the grounding giving rise to this lawsuit. To the best of this deponent's knowledge and belief, the invoices referred to are in Corn Island, Nicaragua at this time.

3) That the attached schedule accurately describes the part number, the nature of the part and its cost price of the materials used in the repair of the O/S Cayenne Madcap. That said parts were necessary to be installed and came from an inventory of parts maintained at Corn Island, Nicaragua for the repair of this and other vessels owned by deponent's various companies. No charge for labor is sought as Plaintiff's own employees provide the labor to install said parts.

Deponent prays that this Honorable Court rule as to liability in this lawsuit and in the event of a result favorable to Deponent, Deponent will undertake to fly to Nicaragua and provide copies of the invoices should this Honorable Court deem such necessary.

FURTHER DEPONENT SAITH NOT.

(s) Manuel A. Sanchez, Jr.
MANUEL A. SANCHEZ, JR.

SUBSCRIBED AND SWORN TO BEFORE ME by the said MANUEL A. SANCHEZ, JR., President of Gulf-Tex Brokerage, Inc., to certify which witness my hand

defendant, the Court will order production of the original invoices for inspection by the defendant before issuing execution on the judgment in this case.

and seal of office this 29th day of March, 1977.

(s) Jeanette M. Gavito
Notary Public, Cameron County, Texas

PARTS FOR REPAIR
O/S CAYENNE MADCAP

B. D. HOLT CO.

| PART NUMBER | TYPE OF PART | COST |
|---|---|---|
| 1 — 9M8968 | Head Assembly | $1,576.79 |
| 1 — 887692 | Cartridge | 739.98 |
| 1 — 6L2932 | Manifold | 728.80 |
| 1 — 6L2774 | Extension | 154.93 |
| 1 — 6L4209 | Shield | 242.93 |
| 1 — 3N613 | Tube | 3.31 |
| 1 — 8B4509 | Fitting | 5.45 |
| 1 — 1S2084 | Line Assembly | 18.80 |
| 1 — 1S2085 | Line Assembly | 18.80 |
| 1 — 1S2086 | Line Assembly | 18.80 |
| 2 — 8F8997 | Nuts (.39) | .78 |
| 1 — 1F1480 | Fitting | 1.37 |
| 1 — 6L2938 | Shield | 22.31 |
| 1 — 6L2937 | Shield | 25.67 |
| 1 — 8M6225 | Engine Gasket | 200.49 |
| 6 — 2M4190 | Nozzle Assembly | 21.60 |
| 1 — 1S2081 | Line Assembly | 18.80 |
| 1 — 1S2082 | Line Assembly | 18.80 |
| 1 — 1S2083 | Line Assembly | 18.80 |
| | Total | $3837.21 |